UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                                                         Case Number: 11-17754-12

    KEVIN W. WEINER,

          Debtor.

---

## DECISION

      The Chapter 12 standing trustee ("Trustee") objected to confirmation of the Debtor's Amended Plan of Reorganization ("Amended Plan"). The crux of the objection was that the direct payment of the secured claim of the United States Farm Service Agency ("FSA") provided for in the Amended Plan was impermissible under the Code. The Trustee characterized the provision as the Debtor's attempt to avoid paying fees to which the Trustee is entitled by statute. After concluding that the Code permits direct payment of at least some secured claims, but is ambiguous as to which secured claims may be paid directly and which may not be, the Court holds that FSA's impaired secured claim can be paid directly. Accordingly, the Trustee's objection is OVERRULED.

## JURISDICTION

      The federal district courts have "original and exclusive jurisdiction" over all cases under title 11 ("Bankruptcy Code" or "Code") and "original but not exclusive jurisdiction" over all civil proceedings that arise under the Bankruptcy Code or that arise in or are related to cases under the Code. 28 U.S.C. §§ 1334(a)–(b). The district courts may, however, refer such cases to the

bankruptcy judges within their district. In the Western District of Wisconsin, the district court has made such a reference. *See* Western District of Wisconsin Administrative Order 161 (July 12, 1984).

Accordingly, this Court "may hear and determine all cases under title 11 and all core proceedings under title 11, or arising in a case under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). Bankruptcy courts determine whether a proceeding is core or non-core. 28 U.S.C. § 157(b)(3). Confirmation of a plan of reorganization under Chapter 12 is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). As such, this Court has both the jurisdiction and the authority to enter a final judgment in this matter.

**FACTS AND PROCEDURAL HISTORY**

Original Plan

The Debtor, Kevin Weiner, filed a petition under Chapter 12 of the Bankruptcy Code on December 30, 2011. He filed a plan on August 1, 2012 ("Original Plan"), in which he identified a claim held by FSA for $332,577.41, secured by a mortgage on the Debtor's real estate. The debt to FSA apparently matured or was accelerated pre-petition. The Original Plan proposed to sell fifty-five acres of real estate and apply the proceeds to this claim, thereby satisfying a portion of the debt. Net of commissions, delinquent real estate taxes, and capital gains taxes, the Debtor expected to reduce FSA's claim to roughly $110,000. That amount was to be amortized and paid over thirty years

2

at 3% interest, yielding an estimated monthly payment of $463.76. FSA was to retain its lien until the amount was paid in full. The Original Plan proposed to pay FSA's claim through the plan—that is, via the Trustee.

FSA objected to the Original Plan and requested adequate protection payments. The Debtor and FSA reached an agreement for adequate protection and for terms of plan treatment, and, following a hearing on confirmation, the Debtor was ordered to file an amended plan that addressed the payment of the FSA claim.

## Amended Plan

After resolving FSA's objection to confirmation of the Original Plan and coming to an agreement regarding adequate protection payments, the Debtor ultimately sold a portion of the real estate. Once the various costs of sale, delinquent real estate taxes, and capital gains taxes were paid, the sale generated enough proceeds to reduce FSA's claim to $137,602.14. The Amended Plan, filed May 2, 2013, amortized this balance over thirty years at 3% interest as provided in the approved Stipulation between the Debtor and FSA. The $580.14 monthly payments were proposed to be paid directly to FSA, bypassing the Trustee. The Trustee objected to the Amended Plan.

## ARGUMENTS

The primary thrust of the Trustee's objection is to the direct payment of the FSA claim as proposed in the Amended Plan. The Trustee asserts that the Debtor obtained the protections of bankruptcy and the oversight of the

Trustee's office—including the opportunity to sell the real estate and reduce the FSA claim—and that these benefits enabled him to formulate a confirmable plan. Morever, the Trustee suggests that had the facts been different with FSA agreeing to the Original Plan and "early sales and creditors to pay other than unsecureds and attorney fees," the Trustee may have agreed to direct payments. Without clear articulation, however, he asserts this case has required a heightened level of Trustee involvement—he points to FSA's objection to the Original Plan, the time it took to sell the real estate, and the presence of unsecured creditors and attorney fees as matters supporting that position. In exchange for this involvement, the Trustee argues, the Debtor should have to pay the fees associated with the administration of the bankruptcy plan.

The Trustee also asserts that even if supervision will not be necessary to protect FSA's rights under the plan going forward, supervision by the Trustee was necessary for the sale of the real estate. Moreover, the Trustee reviewed both Motions to Sell Property filed by the Debtor under section 363. He points out that no fee was charged on the sale of the real estate that reduced the debt to FSA and that, therefore, the Debtor has received all of the advantages of the Trustee's participation in the case without paying Trustee fees on the sale of real estate.

The Debtor's position, by contrast, is that he should be permitted to pay the FSA claim directly for essentially three reasons: 1) nothing in the Code

prohibits him from making direct payments on the secured FSA claim, 2) the fees that would be generated if the FSA claim is paid through the Trustee's office would be disproportionate to the level of Trustee involvement actually required in the case, and 3) having to pay the fees would seriously burden his ability to make the payments provided for in the plan.

## STATEMENT OF LAW

The dispute between the Trustee and the Debtor stems from competing interpretations of a series of provisions in Chapter 12 that are, at best, unclear regarding the secured claims that may be paid directly to the creditor and those that must be paid via the Trustee's office. Although the Trustee is charged with making most payments to creditors, certain Code provisions create an apparent exception to this general rule.

Among these, 11 U.S.C. § 1226(c) states that the Trustee shall make payments to creditors under the plan "*[e]xcept as otherwise provided in the plan* or in the order confirming the plan" (emphasis added). Section 1225(a)(5)(B)(ii) permits confirmation of a plan that provides for the payment of a secured claim from "property to be distributed by the trustee *or the debtor* . . ." (emphasis added). Finally, section 1228(e) states that the Trustee is to be dismissed at the conclusion of the plan term; however, section 1222(b)(9) provides that secured claims can be paid over a period of time that exceeds the plan term. Therefore, secured claims that are to be paid beyond the plan term must be paid by someone besides the Trustee—in other words, by the Debtor.

Whether a claim is paid directly or is paid "through the plan" is of particular interest to the Trustee because of the statutory fee required under 28 U.S.C. § 586(e). Among other things, this section provides that the Trustee may collect a percentage fee from payments the Trustee receives from the Debtor under a plan. 28 U.S.C. § 586(e)(2). Because the language of the statute requires that the Trustee collect the fee only from payments he receives, and not merely payments under the plan, he necessarily cannot collect a fee on payments that are made directly from the Debtor to a creditor.

Reading these provisions together leads to the unavoidable conclusion that at least some secured claims provided for in the plan can be paid directly from the Debtor to a creditor without violating the Code. *See Westpfahl v. Clark (In re Westpfahl),* 168 B.R. 337, 360 (Bankr. C.D. Ill. 1994); *In re Heller*, 105 B.R. 434, 437 (Bankr. N.D. Ill. 1989); *In re Kline*, 94 B.R. 557, 559 (Bankr. N.D. Ind. 1988); *In re Lenz*, 74 B.R. 413, 415 (Bankr. C.D. Ill. 1987). *See also In re Aberegg*, 961 F.2d 1307, 1309-10 (7th Cir. 1992) (noting in Chapter 13 context that language of 11 U.S.C. § 1322(a)(1), which is identical to the language of 11 U.S.C. § 1222(a)(1), is conclusive that bankruptcy courts have discretion to permit direct payments to some secured creditors); *McRoberts v. Associates Commer. Corp. (In re Derickson),* 226 B.R. 879, 881 (Bankr. S.D. Ill. 1998) (noting that Chapter 13 debtors may liquidate estate property and make a single lump sum payment to the creditor).

In the present case, the Trustee concedes that if certain facts in the instant case were different, he might have had no objection to the direct payment of FSA's claim. Trustee's Brief at p. 3. He also notes that direct sales of real estate have proceeded unhindered in the past. *Id.* at p. 2. Therefore, he at least implicitly agrees that *some* secured claims may be paid directly.

The real point of contention, then, is whether *this* secured claim can be paid directly. Unfortunately, the Bankruptcy Code does not give explicit guidance as to secured claims that may properly be paid directly or those that should be paid through the Trustee. *See, e.g., In re Kline,* 94 B.R. at 559 (citing *In re Erickson P'ship,* 83 B.R. 725 (D.S.D. 1988)). Given the uncertainty in the Code, the question is committed to the discretion of the courts, which have reached diverging and inconsistent conclusions on this point. *Id.*

<u>Direct Payments on Impaired Secured Claims Prohibited</u>

There appear to be two lines of judicial thinking on the question of whether impaired secured claims may be paid directly or whether they must be paid through the plan. One line, cited by the Trustee, follows decisions of the courts of appeals for the Ninth and Tenth Circuits that hold categorically that the Code does not permit the direct payment of impaired claims. *See In re Fulkrod,* 973 F.2d 801, 803 (9th Cir. 1992); *In re Schollett,* 980 F.2d 639 (10th Cir. 1992). The courts that have followed this approach do so reasoning that to permit direct payments on impaired secured claims would render the trustee fee provisions of 28 U.S.C. § 586(e) superfluous by allowing the Debtor to

7

bypass them. *Id.* As a result, the courts fear, the economic viability of the Trustee system would be undermined; the need to attract and retain qualified standing trustees requires assurances that adequate compensation will be paid in exchange for the trustee's services. *See In re Fulkrod*, 973 F.2d at 803*; In re Marriott*, 161 B.R. 816, 817 (Bankr. S.D. Ill. 1993). *See also In re Land*, 82 B.R. 572 (Bankr. D. Colo. 1988), *aff'd*, 96 B.R. 310 (D. Colo. 1988); *In re Wright*, 82 B.R. 422 (Bankr. W.D. Va. 1988); *In re Crum*, 85 B.R. 878 (Bankr. N.D. Fla. 1988).

<u>Direct Payments on Impaired Secured Claims Permitted</u>

By comparison, the other line of thinking follows decisions from the Sixth and Eighth Circuits that permit the direct payment of certain impaired secured claims. *See Michel v. Beard (In re Beard)*, 45 F.3d 113, 119 (6th Cir. 1995) (". . . Congress constructed a scheme that envisioned that debtors would at times be able to pay their debts directly to their creditors, allowing them to bypass the trustee."); *Wagner v. Armstrong (In re Wagner)*, 36 F.3d 723, 727-28 (8th Cir. 1994) ("[T]he debtors' plans permit them to make direct payments to their impaired secured creditors, and . . . these provisions of the plans are not in conflict with the bankruptcy code"). These decisions consider the legislative history in the context of the farm crisis that motivated passage of Chapter 12 in 1986. *See In re Beard*, 45 F.3d at 116-17; *In re Overholt*, 125 B.R. 202, 206 (S.D. Ohio 1990); *In re Pianowski*, 92 B.R. 225, 231-32 (Bankr. W.D. Mich. 1988). The resulting interpretations reach the conclusion that direct payments

of impaired secured claims are permissible under certain circumstances. *In re Beard*, 45 F.3d at 116-17; *In re Overholt*, 125 B.R. at 206; *In re Pianowski*, 92 B.R. at 231-32.

Courts that apply this approach have frequently noted that the impetus for Chapter 12 was to facilitate the successful reorganization of struggling farms. With this goal in mind, courts that have permitted direct payments of impaired claims have done so on a case-by-case basis, weighing the trustee's interests against the debtor's efforts to formulate a reasonable and viable plan of reorganization. *See In re Westpfahl*, 168 B.R. at 360; *In re Heller*, 105 B.R. at 437; *In re Kline*, 94 B.R. at 559; *In re Lenz*, 74 B.R. at 415. *See also In re Erickson P'ship*, 83 B.R. at 727-28; *In re Overholt*, 125 B.R. at 206; *In re Pianowski*, 92 B.R. at 231-32.

*The Pianowski Factors*

Despite an admittedly ambiguous collection of Code sections that offers little guidance, some courts have developed rubrics for weighing the competing interests at play in situations like the instant case. Among these, an oft-cited example was articulated by the bankruptcy court for the Western District of Michigan in *In re Pianowski*, 92 B.R. at 233. In that case, the court developed a "non-exclusive" list of thirteen factors that it considered in determining whether to permit direct payment of a secured claim in Chapter 12:

1. *The past history of the debtor*—Was the debtor motivated to seek Chapter 12 relief by a sincere desire to reorganize? Have there

9

      been repetitive filings? Have there been past confirmed but unconsummated plans?

2. *The business acumen of the debtor*—Does the debtor appear capable of operating his farm efficiently in the future? Is he capable of maintaining reliable records concerning the operations of the farm and payments to creditors?

3. *The debtor's post-filing compliance with statutory and court-imposed duties*—Has the debtor complied with all court orders and reasonably cooperated with the trustee? Has the debtor filed accurate reports and accounts as required by the court and the trustee?

4. *The debtor's good faith*—Are the direct payments proposed in good faith? Does the debtor have any improper ulterior motives in proposing direct payments to creditors?

5. *The ability of the debtor to achieve meaningful reorganization absent direct payments*—If a proposed direct payment is not permitted, will the debtor's plan be feasible? Must a direct payment be authorized in order for the debtor to receive a meaningful opportunity to reorganize under Chapter 12?

6. *The plan treatment of each creditor to which a direct payment is proposed to be made*—Is the affected creditor's claim being modified or altered pursuant to its treatment under the proposed plan? Is the debtor current in his or her pre-petition obligations to the affected creditor? If pre-petition default exists, what is the magnitude and type of such defaults? Will any defaults be speedily cured?

7. *The consent, or lack thereof, by the affected creditor to the proposed plan treatment*—Has the creditor consented to receive direct payments from the debtor? Was the affected creditor actively involved in negotiating its proposed treatment under the plan?

8. *The legal sophistication, incentive, and ability of the affected creditor to monitor compliance*—Is the amount of the creditor's allowed claim sufficient to warrant that the creditor will likely monitor future direct payments? Does the creditor have adequate incentives to monitor the debtor's direct payments and bring future defaults to the attention of the trustee and the court? Will it be unduly

burdensome or expensive to require the creditor to monitor future direct payments? Has the affected creditor been represented by competent counsel in connection with the case? Does the creditor have the ability to obtain advice from counsel in the event of default?

9. *The ability of the trustee and the court to monitor future direct payments*—Is the debtor willing to provide periodic reports and accounts to the trustee, and other interested parties, which evidence that direct payments have been timely made? Will the debtor make all direct payments in such a manner so as to conclusively document that the requisite payments have been timely made?

10. *The potential burden on the Chapter 12 trustee*—Is direct supervision by the trustee required or prudent with regard to a given proposed direct payment obligation? Will the approval of direct payments result in a greater or unwarranted burden upon the trustee?

11. *The possible effect upon the trustee's salary or funding of the U.S. Trustee system*—Will authorizing a direct payment result in the standing trustee receiving less than adequate compensation for his efforts, duties, and responsibilities in connection with the case? Will a requested direct payment undermine the funding of the United States Trustee's office?

12. *The potential for abuse of the bankruptcy system*—Will authorizing a direct payment create a prejudicial possibility of preferential treatment between or among those creditors who will receive direct payments and those who will not? Will a proposed direct payment result in any *unfair* discrimination among creditors or classes of creditors? Does the plan address future enforcement problems and explicitly provide for the retention of jurisdiction by the bankruptcy court to offer meaningful relief for a party who has not received a promised direct payment?

13. *The existence of other unique or special circumstances*—Do any other facts exist which weigh favorably or unfavorably with respect to any proposed direct payment?

*In re Pianowski*, 92 B.R. at 233-34.

Having carefully considered the Ninth and Tenth Circuits' approaches prohibiting the direct payment of impaired secured claims, this Court opts to reject them in favor of the more flexible, case-by-case approach advocated by the Sixth and Eighth Circuits.

First, this Court has difficulty reading the relevant provisions of Chapter 12 and the trustee compensation provisions under 28 U.S.C. § 586(e) without concluding that there is substantial statutory authority for direct payment of impaired secured claims. This interpretation comports with a large majority of cases from this circuit and is consistent with the decision of the Seventh Circuit in the *In re Aberegg* case. Although that decision involved a Chapter 13 debtor, many of the relevant provisions bear similar, if not identical, language. As such, the Seventh Circuit's reasoning in favor of direct payments in that case is also persuasive in the Chapter 12 context.

Second, the rigid interpretation advanced by the Ninth and Tenth Circuits and advocated by the Trustee in this case entirely overlooks the underlying bankruptcy policy favoring successful reorganization of troubled entities. In this Court's view, the varying subtleties and competing interests that characterize every case require a more accommodating approach if the promise of the Chapter 12 process is to be fully realized.

Because the Court has chosen to review direct payment provisions on a case-by-case basis, it also finds the thirteen-factor test advanced by the court in *In re Pianowski* to be a useful framework for analysis of the facts presented.

As such, it will adapt that test as necessary in particular cases and use the thirteen factors as analytical guideposts.

## ANALYSIS

As noted, the crux of the present issue is whether the Debtor, having filed an Original Plan that did not contain direct payment provisions, received objections, negotiated a settlement, and carried out the terms of the settlement, all under the shelter of the automatic stay, may now amend his plan to adjust the payment of one secured claim to bypass the Trustee. Guided by the thirteen factors set forth in *In re Pianowski*, the Court makes the following findings concerning whether the proposed direct payment is permissible:

1. *The past history of the Debtor:* It appears this is the Debtor's first bankruptcy filing, and there is no indication that the Debtor is motivated by anything other than a sincere desire to reorganize.

2. *The business acumen of the Debtor:* There is no indication from the record, nor any allegation from any interested party, that the Debtor is not capable of successfully operating his farm and keeping adequate records. After reviewing the record, the Court concludes that the Debtor has the requisite business acumen to carry out a successful Chapter 12 reorganization.

3. *The Debtor's post-filing compliance with statutory and court-imposed duties:* Other than a recent motion to dismiss for the alleged failure to file some operating reports, the record is devoid of any evidence that the Debtor has failed to comply with any requirement imposed by the Code or this Court.

The time to respond to this motion has not expired and no conclusion can be reached at this time regarding the issue. The Trustee gives no indication that the Debtor has failed to cooperate with any reasonable requests. As a result, the Court concludes that the Debtor has fully complied with all required duties.

    4. *The Debtor's good faith:* There is no evidence to suggest that the Debtor has proposed the direct payments for any reason other than to ensure the feasibility of his plan. As such, the Court finds that they have been proposed in good faith.

    5. *The ability of the Debtor to achieve meaningful reorganization absent direct payments:* It is difficult to conclude one way or another whether the Amended Plan would still be feasible if the FSA claim were forced to be paid through the Trustee. Of the information that is available, only the Debtor's petition and schedules give any indication of income and expenses. Since the Debtor filed his petition in December 2011, that information is now twenty-one months old.

    Given the paucity of information concerning the feasibility of the Amended Plan, the Court gives great deference to the Trustee's judgment. In the present case, the Trustee filed no objection to confirmation of the Original Plan. When the Trustee objected to the Amended Plan, he evinced no concerns about the feasibility of the plan; instead, his primary objection was that the direct payment of FSA's claim was improper. As a result, it would seem the

Trustee is not concerned with the feasibility of either the Original Plan or the Amended Plan.

The Debtor, however, does express concern as to the feasibility of the Amended Plan if the FSA claim is required to be paid through the Trustee's office. Although neither party gives specific figures as to the actual amount of the Trustee's fee,[1] it appears that the Trustee would collect roughly $65 per month more, or approximately $2,320 over the course of the plan, if the FSA claim were paid through the plan than if it were paid directly. Although the difference is not much in comparison to the size of the original secured debt to FSA, it is conceivable that this monthly amount could produce a sufficient drag on the Debtor's monthly accounts to threaten the reorganization.

In any event, it would be merely an exercise in speculation to determine one way or another whether the Debtor's plan would be feasible if payments on the FSA claim were to be subject to the Trustee's fee. The Court concludes that there is insufficient information for this factor to weigh heavily in either direction.

6. *The plan treatment of each creditor to which a direct payment is proposed to be made:* The FSA claim was modified following the sale of the real estate to reflect the application of the net proceeds from the sale to the debt. It appears the entire debt to FSA matured pre-petition, meaning the full amount

---

[1] The Trustee cites only the calculation using the maximum 10% fee permitted under 28 U.S.C. § 586(e), but suggests elsewhere that the current fee is 5.5%.

15

was in default at the time the petition was filed. As a result, the Debtor is using the bankruptcy process to "refinance" the debt to FSA and obtain new loan terms. However, the terms of FSA's treatment under the Amended Plan were the result of its direct negotiation with the Debtor and FSA does not object to its treatment.

7. *The consent, or lack thereof, by the affected creditor to the proposed plan treatment:* FSA did not object to the proposed treatment under the Amended Plan. It is apparent from the record that FSA was actively engaged in negotiating the proposed treatment, and that the terms of the Amended Plan comport with the Stipulation the parties reached in response to FSA's objection to the Original Plan. In fact, the proposed treatment embodies what was required under the terms of the approved Stipulation.

8. *The legal sophistication, incentive, and ability of the affected creditor to monitor compliance:* Secured creditors like FSA are, in the Court's experience, generally sophisticated and more than capable of asserting their rights and defending their interests. That competence was evident in this case by virtue of FSA's objection to the Original Plan, its Motion for Adequate Protection, and the negotiated Stipulations that resolved both. FSA was represented by the United States Attorney for the Western District of Wisconsin, and will presumably continue to be represented for the duration of its relationship with the Debtor. As such, the Court has no concerns as to the competence or

incentive of FSA to ensure the new deal proposed in the Amended Plan is carried out by the Debtor.

9. *The ability of the Trustee and the Court to monitor future direct payments:* There is no indication that the Debtor has offered or been asked to provide any reports to assist the Court or the Trustee to monitor the performance of his direct payment obligation. Given the sophistication and competence of FSA, however, the Court does not believe such supervision by the Court or the Trustee is necessary.

10. *The potential burden on the Chapter 12 trustee:* As noted, the direct payment to FSA does not require the supervision of the Trustee in light of FSA's sophistication and competent representation. No burden will be shifted to the Trustee in the course of the performance of the Debtor's direct payment obligations. Further, since FSA held a perfected mortgage on the real property that was sold, it was in the best position to review and monitor the sale that occurred without the necessity of supervision by the Trustee.

11. *The possible effect upon the Trustee's fee or funding of the U.S. Trustee system:* To start, the Court lacks much detail concerning the Trustee's fees or the funding of his office and operations. Moreover, the Court will not presume to fully understand the costs of the Trustee's operations or the effort necessary to administer each case.

That said, the docket reflects a handful of entries from the Trustee that were pertinent to the administration of FSA's claim. Two entries concern

motions to sell real estate by the Debtor that were central to resolving FSA's objection to the Original Plan. It appears neither motion required a hearing. Beyond this, however, it does not appear that much was required from the Trustee until the present dispute required briefing and argument. The remainder of the Trustee's activities in this case appear to be in the ordinary course of its operations. No action other than reviewing the motions appears to have been necessary on its part to facilitate the sale of the real estate or the settlement of FSA's objection to confirmation.

To the contrary, it may be that the Trustee's chief concern is that the direct payment of secured claims deprives him of revenue. He has couched his arguments in terms of the propriety of paying FSA's impaired claim directly; however, FSA's claim would have been impaired under either the Original Plan or the Amended Plan. In reality, whether a claim is impaired is less significant than the circumstances under which the proposal for direct payment was made, the conduct of the Debtor, and the involvement of the Trustee in the bankruptcy. Indeed, most secured claims are impaired, particularly in Chapter 12 cases. As such, by the logic of the Trustee's argument, few—if any—secured claims in Chapter 12 could be paid directly unless the Trustee consented to that treatment. This Court has concluded that the direct payment of some secured claims is permissible by the terms of the Code—but it is within the Court's discretion, not the Trustee's, to determine the secured claims that qualify.

12. *The potential for abuse of the bankruptcy system:* FSA is the only remaining secured creditor in the case. As such, the Court sees no possibility for preferential treatment or discrimination. Likewise, given that the Court will review objections to plans that contain direct payment provisions on a case-by-case basis, there is no concern that this decision will set a precedent that will enable abuse of the bankruptcy system.

13. *The existence of other unique or special circumstances:* There do not appear to be any unique or special circumstances that weigh one way or another with respect to the direct payment of FSA's claim.

## CONCLUSION

In light of the foregoing analysis, the Court concludes that the direct payment of FSA's secured claim comports with the requirements of the Code and is permissible. Accordingly, the Trustee's objection is OVERRULED.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated:  August 22, 2013

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge